UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                                                            :
CHEMICAL OVERSEAS HOLDINGS, INC.,                           :
CREDIT SUISSE FIRST BOSTON AND                              :
DRESDNER BANK LATEINAMERIKA AG,                             :
                                                            :
                Petitioners,                                : Case No. 05 Civ. 260 (GEL)
                                                            :
        vs.                                                 : ECF CASE
                                                            :
REPUBLICA ORIENTAL DEL URUGUAY,                             :
                                                            :
                Respondent.                                 :
------------------------------------------------------------x

# REPLY MEMORANDUM OF LAW IN SUPPORT OF
# PETITION TO CONFIRM ARBITRATION AWARD

O'MELVENY & MYERS LLP
Times Square Tower
7 Times Square
New York, New York 10036
Tel: (212) 326-2000
Fax: (212) 326-2061

*Attorneys for Petitioners Chemical Overseas
Holdings, Inc., Credit Suisse First Boston
and Dresdner Bank Lateinamerika AG*

# TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................................................................1

FACTUAL BACKGROUND..................................................................................................1

I. THE PUBLIC POLICY GROUND ASSERTED BY THE ROU AS A BASIS TO REFUSE CONFIRMATION OF THE AWARD DOES NOT APPLY ...........................2

    A. The RoU Waived Any Defense to Judicial Confirmation of the Award Predicated on the *Ex Parte* Uruguayan Order .......................................................3

    B. Confirmation of the Award Would Not Compel the RoU to Violate the *Ex Parte* Uruguayan Order ............................................................................................4

        1. Confirming the Award Would Merely Preserve the *Status Quo* .................5

        2. Confirmation of the Award Does Not Compel Payment............................6

    C. Public Policy Interests Favor Confirmation of the Award ......................................8

II. THERE IS NO BASIS FOR A STAY OF THIS PROCEEDING ...................................9

CONCLUSION .....................................................................................................................10

# TABLE OF AUTHORITIES

Page

## CASES

*A. Halcoussis Shipping Ltd. v. Golden Eagle Liberia Ltd.*,
　No. 88 Civ. 4500 (MJL), 1989 WL 115941 (S.D.N.Y. Sept. 27, 1989) ................................... 5

*Allstate Life Ins. Co. v. Linter Group Ltd.*,
　994 F.2d 996 (2d Cir. 1993) ................................................................................................. 10

*Caribbean Trading & Fid. Corp. v. Nigerian Nat'l Petroleum Corp.*,
　No. 90 Civ. 4169 (JFK), 1990 U.S. Dist. LEXIS 17198 (S.D.N.Y.
　Dec. 18, 1990) ...................................................................................................................... 10

*Cunard S.S. Co. v. Salen Reefer Servs. AB*,
　773 F.2d 452 (2d Cir. 1985) .......................................................................................... 6, 8, 10

*Europcar Italia, S.p.A. v. Maiellano Tours, Inc.*,
　156 F.3d 310 (2d Cir. 1998) ............................................................................................ passim

*Florasynth, Inc. v. Pickholz*,
　750 F.2d 171 (2d Cir. 1984) ................................................................................................ 5, 6

*Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr S.A.*,
　377 F.3d 1164 (11th Cir. 2004) ............................................................................................ 10

*Hewlett-Packard Co. v. Berg*,
　61 F.3d 101 (1st Cir. 1995) ................................................................................................... 10

*MGM Prods. Group, Inc. v. Aeroflot Russian Airlines*,
　No. 03 Civ. 0500 (RMB), 2003 WL 21108367 (S.D.N.Y. May 14, 2003),
　*aff'd*, No. 03-7561, 2004 WL 234871 (2d Cir. Feb. 9, 2004), *cert. denied*, 125
　S. Ct. 409, 160 L. Ed. 2d 318 (2004) .................................................................................... 10

*Nat'l Oil Corp. v. Libyan Sun Oil Co.*,
　733 F. Supp. 800 (D. Del. 1990) ............................................................................................. 7

*Nat'l Wrecking Co. v. Int'l Bhd. of Teamsters, Local 731*,
　990 F.2d 957 (7th Cir. 1993) ............................................................................................... 3, 4

*Nedagro B.V. v. Zao Konversbank*,
　No. 02 Civ. 3946 (HB), 2003 U.S. Dist. LEXIS 787 (S.D.N.Y. Jan. 21, 2003) ................... 10

*Parsons & Whittemore Overseas Co. v. Societe Generale de L'Industrie du
　Papier (RAKTA)*, 508 F.2d 969 (2d Cir. 1974) ...................................................................... 4

*Pike v. Freeman*,
　266 F.3d 78 (2d Cir. 2001) ..................................................................................................... 8

*Revere Copper & Brass Inc. v. Overseas Private Inv. Corp.*,
　628 F.2d 81 (D.C. Cir. 1980) .................................................................................................. 5

# TABLE OF AUTHORITIES
(continued)
Page

*Sarhank Group v. Oracle Corp.*,
 No. 01 Civ. 1285 (DAB), 2002 WL 31268635 (S.D.N.Y. Oct. 9, 2002) ...................9

*Scherk v. Alberto-Culver Co.*,
 417 U.S. 506 (1974) ...................8

*Sea Dragon, Inc. v. Gebr. Van Weelde Scheepvaartkantoor B.V.*,
 574 F. Supp. 367 (S.D.N.Y. 1983) ...................3, 4, 7

*Smithkline Beecham Biologicals, S.A. v. Biogen, Inc.*,
 No. 95 Civ. 4988 (JGK), 1996 WL 209897 (S.D.N.Y. Apr. 29, 1996) ...................4

*Ukrvneshprom State Foreign Econ. Enter. v. Tradeway, Inc.*,
 No. 95 Civ. 10278 (RPP), 1996 WL 107285 (S.D.N.Y. Mar. 12, 1996) ...................5, 10

*Victrix S.S. Co. v. Salen Dry Cargo A.B.*,
 65 B.R. 466 (S.D.N.Y. 1986), *aff'd*, 825 F.2d 709 (2d Cir. 1987) ...................6

*Waterside Ocean Navigation Co. v. Int'l Navigation Ltd.*,
 737 F.2d 150 (2d Cir. 1984) ...................4, 8

*Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc.*,
 126 F.3d 15 (2d Cir. 1997) ...................6

## STATUTES

9 U.S.C. § 13 (1999) ...................7

9 U.S.C. § 207 (1999) ...................8

28 U.S.C. § 1610 (1994) ...................7

Fed. R. Civ. P. 54 ...................6

Fed. R. Civ. P. 69 ...................6

## OTHER AUTHORITIES

13 James Wm. Moore et al., Moore's Federal Practice P. 69.02 (3d ed. 1999) ...................7

Business & Commercial Litigation in Federal Courts § 44.3(a) (Robert L. Haig
 ed., 1998) ...................6

ICC Arbitration Rules, Art. 28(6) ...................5

## Introduction

Absent any basis to challenge either the procedure of the ICC arbitration or the substance of the unanimous Award rendered by the Arbitral Tribunal, the RoU has resorted to stalling tactics in an effort to convince this Court to defer judicial confirmation of the RoU's uncontested obligations to Petitioners.[1] The RoU argues that confirmation of the Award at this time would offend public policy by compelling the RoU to violate an *ex parte* order of provisional remedies issued by a Uruguayan court (the "*Ex Parte* Uruguayan Order").

The RoU's argument fails for several reasons. *First,* the RoU waived any objection or defense based on the *Ex Parte* Uruguayan Order by failing to raise any "public policy" or "comity" concerns during the two-year arbitration process. *Second,* as the RoU implicitly concedes, confirmation of the Award and entry of judgment would not compel the RoU to act inconsistently with the *Ex Parte* Uruguayan Order, and thus does not implicate international comity. *Third,* confirmation of the Award would be entirely consistent with public policy, which encourages the recognition and enforcement of commercial arbitration agreements in international contracts. Moreover, it would be inconsistent with U.S. public policy for this court to defer to an *ex parte* foreign court order whose validity is subject to serious procedural and due process challenges. For all of these reasons, the Court should grant Petitioners' request for confirmation.

## Factual Background

It is important to understand the context of the *Ex Parte* Uruguayan Order that the RoU relies upon – for the first time – in this proceeding to confirm the Award. The *Ex Parte* Uruguayan Order was obtained in early January 2003 by Argentine plaintiffs in connection with

---

[1] Petitioners assume familiarity with the facts and defined terms used in Petitioners' Memorandum of Law dated January 11, 2005. Petitioners are submitting herewith the Declaration of Sandra Gonzalez, dated February 24, 2005 ("Gonzalez Decl."), as well as a Proposed Order. All unreported cases are attached hereto in alphabetical order.

an unrelated civil lawsuit in Uruguay (the "*Crespi* litigation"). *See* Gonzalez Decl. at ¶ 13; Kimmelman Decl. at ¶ 28. The *Crespi* litigation is one of many that were filed in the wake of the January 2002 disclosure of a fraud that threatened the solvency of various banks and entities in Uruguay, Argentina and Panama. Gonzalez Decl. at ¶¶ 3-5. The *Crespi* litigation is a civil action for damages asserting claims against more than twenty individuals and entities, including the Petitioners. *Id.* at ¶ 8. The RoU is not a party to the *Crespi* litigation. *Id.* The *Ex Parte* Uruguayan Order is a provisional remedy that enjoins Petitioners from altering their rights under the Agreement and attaches the credits of Petitioners under the Agreement (namely the credit for US$100 million). *Id.* at ¶ 14.

On January 31, 2003, approximately three weeks after the issuance of the *Ex Parte* Uruguayan Order, Petitioners filed their Request for Arbitration. *See* Kimmelman Decl. at ¶ 34. The RoU submitted its Answer in March 2003. *Id.* at ¶ 35. The Terms of Reference signed by the parties specifically outlined the parties' respective claims and defenses and the issues to be decided by the Arbitral Tribunal. *Id.* at ¶ 37. Throughout the arbitration, the RoU never raised the *Ex Parte* Uruguayan Order as a defense or as a basis to deny the relief sought by Petitioners.

## I. THE PUBLIC POLICY GROUND ASSERTED BY THE ROU AS A BASIS TO REFUSE CONFIRMATION OF THE AWARD DOES NOT APPLY

The RoU's only argument against confirmation of the Award is that it would compel the RoU to violate the *Ex Parte* Uruguayan Order, thus violating public policy under Article V(2)(b) of the New York Convention. Not only has the RoU waived this argument, but it is also fundamentally flawed and the RoU has failed to meet its burden of proving its public policy defense. *See Europcar Italia, S.p.A. v. Maiellano Tours, Inc.*, 156 F.3d 310, 313 (2d Cir. 1998).

### A. The RoU Waived Any Defense to Judicial Confirmation of the Award Predicated on the *Ex Parte* Uruguayan Order

The RoU bases its public policy defense entirely on the *Ex Parte* Uruguayan Order issued in January 2003 by a Uruguayan Court in the *Crespi* litigation. As the Award makes clear, during the two-year long arbitration, the RoU never asserted the *Ex Parte* Uruguayan Order as a defense in that proceeding. Consequently, the RoU is barred from asserting the *Ex Parte* Uruguayan Order as a defense here. It is well-settled that if a party "failed to raise [an] issue . . . to the arbitrators, the issue is forfeited." *Europcar*, 156 F.3d at 315. As explained by the decision of the Seventh Circuit in *Nat'l Wrecking Co. v. Int'l Bhd. of Teamsters, Local 731*, 990 F.2d 957 (7th Cir. 1993), relied upon by the Second Circuit in *Europcar*:

> Failure to present an issue before an arbitrator waives the issue in an enforcement proceeding. Parties . . . cannot stand by during arbitration, withholding certain arguments, then, upon losing the arbitration, raise such arguments in federal court. We will not tolerate such sandbagging. Permitting parties to keep silent during arbitration and raise arguments in enforcement proceedings would undermine the purpose of arbitration which is to provide a fast and inexpensive method for the resolution of labor disputes.

*Id.* at 960-61 (citations and quotations omitted). The ICC arbitration concerned the adjudication of Petitioners' rights under the Agreement and resulted in an Award in favor of Petitioners. This judicial proceeding concerns confirmation of those rights as set forth in the Award. If the RoU believed that the rights asserted by Petitioners would conflict with the *Ex Parte* Uruguayan Order, the RoU should have raised that in the ICC arbitration, rather than waiting until it had lost.

This point is illustrated in *Sea Dragon, Inc. v. Gebr. Van Weelde Scheepvaartkantoor B.V.*, 574 F. Supp. 367 (S.D.N.Y. 1983), relied upon by the RoU. In *Sea Dragon*, the respondent specifically raised the issue of the foreign attachment order as a defense in the arbitration. Rejecting the defense, the arbitral panel ordered the respondent to direct "present payment" to the petitioner. *Id.* at 372. The court refused to enforce the award on the public policy grounds that to

do so would violate the foreign attachment order. *Id.* Unlike in *Sea Dragon*, the RoU *never* raised the *Ex Parte* Uruguayan Order as a defense in the ICC arbitration, and the Arbitral Tribunal *did not order the "present payment"* of any amount, but rather issued an Award adjudicating the rights and obligations of the parties under the Agreement. The RoU is in a fundamentally different position from the respondent in *Sea Dragon*, who did not wait to make its public policy argument until it was clear it had lost the arbitration. Having failed to assert its public policy defense in arbitration, the RoU cannot raise it now. *See Nat'l Wrecking Co.,* 990 F.2d at 960-61.

### B. Confirmation of the Award Would Not Compel the RoU to Violate the *Ex Parte* Uruguayan Order

Even absent the RoU's waiver, the public policy exception does not apply here because confirmation of the Award will merely preserve the *status quo* and will not conflict with the *Ex Parte* Uruguayan Order. It is well-settled that the public policy defense "should be construed narrowly." *Parsons & Whittemore Overseas Co. v. Societe Generale de L'Industrie du Papier (RAKTA),* 508 F.2d 969, 973 (2d Cir. 1974) ("The general pro-enforcement bias informing the Convention . . . points toward a narrow reading of the public policy defense. An expansive construction of this defense would vitiate the Convention's basic effort to remove preexisting obstacles to enforcement."). A court may only refuse to enforce a foreign arbitral award on public policy grounds "where enforcement would violate the forum state's most basic notions of morality and justice." *Id.* at 974; *see also Europcar,* 156 F.3d at 315 (quoting same and refusing to apply the public policy exception); *Waterside Ocean Navigation Co. v. Int'l Navigation Ltd.,* 737 F.2d 150, 152 (2d Cir. 1984) (same).

In cases involving a potential conflict with a foreign order, the public policy exception only applies where an award "*compels* a party to *violate* the decree of a foreign court." *Smithkline Beecham Biologicals, S.A. v. Biogen, Inc.,* No. 95 Civ. 4988 (JGK), 1996 WL

209897, at *6 (S.D.N.Y. Apr. 29, 1996) (emphasis added) (confirming award over a public policy objection because the award did not compel respondent to violate a foreign order). The award "'must be so misconceived that it compels the violation of law or conduct contrary to accepted public policy.'" *A. Halcoussis Shipping Ltd. v. Golden Eagle Liberia Ltd.*, No. 88 Civ. 4500 (MJL), 1989 WL 115941, at *2 (S.D.N.Y. Sept. 27, 1989) (quoting *Revere Copper & Brass Inc. v. Overseas Private Inv. Corp.*, 628 F.2d 81, 83 (D.C. Cir. 1980) (internal quotations omitted)). Under these standards, the RoU's public policy argument must be rejected.

### 1. Confirming the Award Would Merely Preserve the *Status Quo*

At a minimum, confirmation of the Award would merely preserve the *status quo*. It is firmly established in the Second Circuit that a final arbitration award is already binding as a matter of contract, even without confirmation by the Court. *Florasynth, Inc. v. Pickholz*, 750 F.2d 171, 176 (2d Cir. 1984) ("The award need not actually be confirmed by a court to be valid. An unconfirmed award is a contract right that may be used as the basis for a cause of action.") (citations omitted); *see also Ukrvneshprom State Foreign Econ. Enter. v. Tradeway, Inc.*, No. 95 Civ. 10278 (RPP), 1996 WL 107285, at *4 (S.D.N.Y. Mar. 12, 1996) ("The binding effect of an arbitral award is well established in American courts."); Agreement at § 11(b)(i)(E) (the Award is "final and binding" upon the parties and "not subject to appeal"); ICC Arbitration Rules, Art. 28(6) ("Every Award shall be binding on the parties."). The Agreement also explicitly provides that any monetary obligation resulting from an arbitration between the parties must be paid "on or before the thirtieth (30th) calendar day following the decision or such other date as the decision may provide." Agreement at § 11(b)(i)(D). Judicial confirmation of the Award will not therefore change the current rights and obligations of the parties. If anything, confirmation of the Award would arguably *enhance* the goal of the *Ex Parte* Uruguayan Order because it would recognize Petitioners' rights in the form of a judgment of this Court, making the attachment of

the Award more valuable to the *Crespi* plaintiffs.[2]

## 2. Confirmation of the Award Does Not Compel Payment

The RoU wrongly argues that confirmation of the Award would compel the RoU to pay Petitioners $100 million, and that confirmation would force the RoU to violate the *Ex Parte* Uruguayan Order. *See* RoU Opposition at 7. Even if one were to assume, *arguendo*, that *payment* by the RoU of the Award would violate the *Ex Parte* Uruguayan Order,[3] that issue is simply not before this Court.

At this time, Petitioners seek judicial confirmation of the Award and entry of judgment. They do not ask this Court to *execute* that judgment. *See* Proposed Order at ¶ 14. There is a fundamental difference between a *judgment* confirming an award and the *execution* of that judgment. A judicial confirmation proceeding "merely makes what is already a final arbitration award a *judgment* of the court." *Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc.*, 126 F.3d 15, 23 (2d Cir. 1997) (emphasis added) (quotations and citations omitted).[4] Judgment alone does not compel payment. Rather, a party seeking to enforce a judgment must separately

---

[2] The bankruptcy cases cited by the RoU are completely inapposite because the *Ex Parte* Uruguayan Order was issued in aid of a civil litigation, not a bankruptcy proceeding. The Second Circuit has noted that the "granting of comity to a foreign bankruptcy proceeding" has a "different rationale," and distinguished between the "federal public policy in favor of arbitration" and "the public interest in the fair and efficient distribution of assets in a bankruptcy," which is not at issue here. *Cunard S.S. Co. v. Salen Reefer Servs. AB*, 773 F.2d 452, 458, 459 (2d Cir. 1985). Bankruptcy cases also involve statutory provisions that specifically relate to foreign bankruptcy proceedings, and which again, do not apply here. *See, e.g., Victrix S.S. Co. v. Salen Dry Cargo A.B.*, 65 B.R. 466, 469 (S.D.N.Y. 1986) (citing 11 U.S.C. § 304), *aff'd*, 825 F.2d 709 (2d Cir. 1987).

[3] Petitioners do not concede that either execution or attachment would violate the *Ex Parte* Uruguayan Order. However, that issue need not be decided here because Petitioners only seek an order and judgment confirming the Award.

[4] A judgment is "the concluding judicial act or pronouncement of the court disposing of the matter before it by which the issues in a case are finally resolved and the rights and liabilities of the parties with regard to the action commenced are fixed." Business & Commercial Litigation in Federal Courts § 44.3(a) (Robert L. Haig ed., 1998); *see also* Fed. R. Civ. P. 54(a). By contrast, execution is the process to *enforce* a judgment. *See* Fed. R. Civ. P. 69(a) ("Process to enforce a judgment for the payment of money shall be a writ of execution, unless the court directs otherwise."); *see also Florasynth*, 750 F.2d at 176 (recognizing distinction between a court order confirming an award and the "variety of remedies available to enforce the judgment"). Judgment and execution are distinct steps in the litigation process. While often a prevailing party will seek judicial confirmation and execution *in tandem*, that is not the case here.

seek a "writ of execution" to be able to collect a monetary award.[5]

The RoU wrongly tries to equate confirmation of the Award with an execution on it. *See* RoU Opposition at 7 ("[Respondent] could obey the United States court and pay the judgment, thus violating the order of the court in Uruguay").[6] Contrary to the RoU's assertion, a judgment confirming the Award would not "compel" the RoU to do anything, much less make present payment.[7] *See* Proposed Order at ¶ 14. Confirmation would therefore be completely consistent with the *Ex Parte* Uruguayan Order, and could not possibly raise any concerns of international comity.

This issue was squarely addressed in *Nat'l Oil Corp. v. Libyan Sun Oil Co.*, 733 F. Supp. 800 (D. Del. 1990), in which the court confirmed the arbitration award precisely because it recognized the difference between "mere entry of judgment," and the actual transfer of assets, which in that case were barred by Libyan sanctions. The court stated:

> [Petitioner] is asserting an *in personam* claim [to confirm an arbitration award] that consists of nothing more than an effort to establish liability and fix damages. No property in the United States would be affected by the mere entry of judgment.
>
> . . .
>
> The Libyan Regulations prohibit only those judicial acts that transfer Libyan property or property interests. Thus, the Libyan Regulations do not bar this Court from entering judgment in this case . . . .

*Id.* at 811, 813.

Like the Libyan Regulations in *Nat'l Oil Corp.*, the *Ex Parte* Uruguayan Order does not prohibit this Court or any other from entering judgment confirming the Award, just as it did not

---

[5] "A writ of execution is an order issued by a court, in the form of a final process designed to enforce a money judgment, directing an officer of the court to seize the property of a judgment debtor and transfer the proceeds over to the judgment creditor." 13 James Wm. Moore et al., Moore's Federal Practice P. 69.02 (3d ed. 1999); *see also* 9 U.S.C. § 13 (1999) (distinguishing an "order" confirming an arbitration award, "entry of judgment" on that order, and enforcement of that judgment); 28 U.S.C. §§ 1610 (a) and (c) (1994) (regulating *execution* "upon a judgment entered by a court," and permitting a stay of *execution* until "a reasonable period of time has elapsed following the entry of judgment" and notice).

[6] The RoU is not a party to the *Crespi* litigation and thus confirmation of the Award poses no danger of the RoU "having to pay the $100 million twice," as suggested by the RoU in its opposition. RoU Opposition at 7.

[7] The *Sea Dragon* court did not address the distinction between entry of judgment and execution of judgment – apparently because it had concluded that the arbitration award in that case itself compelled present payment. *See Sea Dragon*, 574 F. Supp. at 372.

prohibit the parties from arbitrating their rights under the Agreement. In fact, the RoU implicitly concedes that judicial confirmation alone would not violate the *Ex Parte* Uruguayan Order.[8] As such, the RoU's expressed concern that execution and attachment may someday "result" from judicial confirmation of the Award is simply irrelevant, and it is premature for the RoU to anticipate it will default on its bond offerings in the event Petitioners seek execution in the future.[9]

### C. Public Policy Interests Favor Confirmation of the Award

Contrary to Respondent's contention, public policy interests actually weigh in favor of confirming the Award. Confirmation would promote the overriding purpose of the Convention "'to encourage recognition and enforcement of commercial arbitration agreements in international contracts.'" *Waterside*, 737 F.2d at 152 (quoting *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 520 n.15 (1974)). *See also Europcar*, 156 F.3d at 318 ("[T]he primary goal of the Convention is to facilitate the recognition and enforcement of arbitral awards[.]"); *accord Pike v. Freeman*, 266 F.3d 78, 89 (2d Cir. 2001) (noting the "strong federal policy favoring arbitration, the enforcement of arbitration agreements and the confirmation of arbitration awards").

Even more importantly, it would be *contrary* to public policy for this Court to deny or delay confirmation of the Award out of deference to the *Ex Parte* Uruguayan Order. *See Cunard*, 773 F.2d at 457 ("in order for comity to be extended, the foreign court must abide by fundamental

---

[8] *See, e.g.*, RoU Opposition at 7 ("The result of a judgment confirming arbitration would be an order, presumably enforceable by execution, attachment, and the full power of the United States judicial system, directing the RoU to pay Petitioners $100 million . . . The RoU could not, consistent with that attachment order, pay Petitioners $100 million.").

[9] RoU Opposition at 8 ("Entry of a judgment confirming the arbitration award here raises the possibility that future Court actions to enforce the award, such as execution or attachment, might constitute such an 'event of default,' with significant and troubling potential consequences to the RoU."). In any event, the potential adverse consequence to a losing party in the future is not one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the Convention. 9 U.S.C. § 207 (1999). In fact, entry of a judgment confirming the Award would not have any additional impact on the RoU's "reputation as a sovereign nation" (RoU Opposition at 8) because the amount is already due and owing to Petitioners and that debt has been widely publicized. *See* Gonzalez Decl. at ¶ 18.

standards of procedural fairness"). The *Crespi* plaintiffs sought the provisional remedies on an *ex parte* basis during a judicial recess, thereby precluding Petitioners from an opportunity to challenge the request at the onset.[10] The court granted the *Ex Parte* Uruguayan Order remedies even though the *Crespi* plaintiffs *failed* to present the requisite competent evidence establishing a probability of success on the merits and *failed* to establish the requisite element of the risk of Petitioners' insolvency. Moreover, the Uruguayan court *failed* to require the *Crespi* plaintiffs to post an adequate counter-guaranty.[11] Even if confirmation otherwise would violate the *Ex Parte* Uruguayan Order – which it would not – it would offend U.S. public policy to refuse to confirm the unanimous Award, rendered by a distinguished panel of ICC arbitrators, out of deference to an *ex parte* foreign order that is the subject of serious procedural and due process challenges.

## II. THERE IS NO BASIS FOR A STAY OF THIS PROCEEDING

Finally, there is no basis for the Court to stay this confirmation proceeding as requested by the RoU. The Second Circuit has warned:

> [T]he adjournment of enforcement proceedings impedes the goals of arbitration—the expeditious resolution of disputes and the avoidance of protracted and expensive litigation. . . . A stay of confirmation should not be lightly granted lest it encourage abusive tactics by the party that lost in arbitration.

*Europcar,* 156 F.3d at 317 (citations omitted).[12]

The cases relied upon by the RoU in support of its request for a stay are inapplicable. They all relate to either Article VI of the Convention, which is not applicable because it provides for a stay of confirmation proceedings only where there are parallel actions to confirm or vacate

---

[10] In fact, to this day, Petitioners have been denied full access to the decrees of the court and the court's file.
[11] Naturally, Petitioners appealed the *Ex Parte* Uruguayan Order. Those appeals are still pending. Although Petitioners do not concede that the *Ex Parte* Uruguayan Order is valid or enforceable, those issues need not be decided for purposes of this motion.
[12] District courts have broad discretion to deny adjournments in deference to the strong national policy in favor of the recognition and enforcement of arbitration awards. *See Europcar,* 156 F.3d at 318; *Sarhank Group v. Oracle Corp.,* No. 01 Civ. 1285 (DAB), 2002 WL 31268635, at *6 (S.D.N.Y. Oct. 9, 2002) ("[b]alancing the concerns of expediency and comity," the court confirmed the award and denied a stay despite ongoing foreign proceedings).

the award,[13] *foreign* stays of creditor actions in favor of consolidated bankruptcy proceedings (which is simply inapposite here),[14] or other "peculiar" circumstances not at issue here.[15] None of these grounds apply in this case, and the RoU has offered no other rationale for a stay. Under these circumstances, the request for a stay should be denied. *See Ukrvneshprom*, 1996 WL 107285, at *8 (confirming award and denying stay despite foreign proceedings because defendant was trying to "avoid the effect of the Award" through "obstructive litigation"); *MGM Prods. Group, Inc. v. Aeroflot Russian Airlines,* No. 03 Civ. 0500 (RMB), 2003 WL 21108367, at *5 (S.D.N.Y. May 14, 2003) (denying stay where the party requesting it "[had] not persuaded the Court that a stay [was] appropriate"), *aff'd*, No. 03-7561, 2004 WL 234871 (2d Cir. Feb. 9, 2004), *cert. denied,* 125 S. Ct. 409, 160 L. Ed. 2d 318 (2004).

## Conclusion

For the foregoing reasons, Petitioners respectfully request that the Court grant the relief requested in the attached Proposed Order, as well as any such other and further relief as may be just and appropriate.

Dated: New York, New York
February 25, 2005

Respectfully submitted,
O'MELVENY & MYERS LLP
By: /s/ Louis B. Kimmelman
    Louis B. Kimmelman (LK7154)
    Dana C. MacGrath (DM6418)
    Marissa Molé (MM4168)
    7 Times Square, NY, NY 10036
    Tel: 212-326-2000; Fax: 212-326-2061

---

[13] *See Europcar*, 156 F.3d at 316; *Nedagro B.V. v. Zao Konversbank*, No. 02 Civ. 3946 (HB), 2003 U.S. Dist. LEXIS 787, at *14 (S.D.N.Y. Jan. 21, 2003); *Caribbean Trading & Fid. Corp. v. Nigerian Nat'l Petroleum Corp.*, No. 90 Civ. 4169 (JFK), 1990 U.S. Dist. LEXIS 17198, at *17 (S.D.N.Y. Dec. 18, 1990).

[14] *See Allstate Life Ins. Co. v. Linter Group Ltd.,* 994 F.2d 996, 999 (2d Cir. 1993) ("Australian law provides a stay procedure to centralize all claims and enable the assets of a debtor to be dispersed in an equitable, orderly, and systematic manner.") (citations and quotations omitted); *Cunard,* 773 F.2d at 454 (referring to the "Swedish court's stay on creditor actions").

[15] *See Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr S.A.*, 377 F.3d 1164, 1172 n.7 (11th Cir. 2004) (noting that the District Court "may consider" a stay pending the appeal of a Venezuelan order holding that arbitration of the parties' dispute was improper under Venezuelan law); *Hewlett-Packard Co. v. Berg,* 61 F.3d 101, 105 (1st Cir. 1995) (finding that the District Court had authority to issue a stay "in the peculiar circumstances of this case," which involved the need for a new and separate arbitration to resolve the remaining issues in the case).